May it please the court, Lloyd Snook here along with Christian Connell on behalf of Benjamin Galecki and Charles Burton Ritchie. Of course, this court having considered, and two of the members of this panel were on the panel last year, when you remanded to the lower court to consider the question of whether Dr. Barrier's testimony was material, the court having found that Judge Jackson erred in excluding it pursuant to privilege. There was also jury instruction issue that you said that the court had basically, while there could have been a more helpful instruction to the defense, it was not an abuse of discretion. And then finally, there are a whole series of other issues that we had raised before that basically you didn't comment on at all. And so we have gone ahead and reasserted those. But I mean, frankly, I was prepared to talk mainly about the first issue unless the court particularly wants us to get into the other issues. I will note that on the other issues, both the jury instructions issue and the other issues about Claude Cosey and so on, there have been other decisions by other district courts, trial courts that have admitted that kind of evidence, and specifically Claude Cosey's testimony in particular, one decision that came out two days after we filed our reply brief. And I'll get that citation to the court, supplemental proceeding of some sort. So we're asking that the court join the other courts that have considered this issue, considered Dr. Barrier's testimony in particular, the courts in California and Kansas and Nevada. And rule number one, that Dr. Barrier's testimony is material and is not merely cumulative. And number two, allowing us to present the evidence from Claude Cosey and others. As far as the relief specifically that we're asking for, we're asking to have a remand court. And these are all district court cases? They're all district court cases, yes. So were there other experts, as it was in this case, who were going to testify to the same? Yes. So Dr. Barrier, were they the same people? In one of the cases, Dr. Dudley also testified for the defense. I don't remember. I'm thinking in particular the most recent case was the one that. Barrier wasn't the only person. There were other experts who testified. Correct. In fact, one of the cases, the Nevada case, we have not yet tried the Nevada case. It will actually go to trial starting on May 13th is the current plan. So we'll know more. A motion in limine or a motion to exclude, and the district court's already ruled on that. Correct. And so, in fact, we have the benefit at this point of the designation of Dr. Barrier as an expert in that case. So, I mean, it's a case that I'm involved in also, representing Mr. Ritchie out there as well. Well, I assume that your best argument about Dr. Barrier is that he would be able to avoid the higher gun cross-examination. Absolutely. Absolutely. And that was one of the points that we discussed when the rest of us were here a year ago, and specifically the point that we would feel. For example, we noticed in the cross-examination of Dr. Dudley, both times that Dr. Dudley was cross-examined by the defense, both in the case that resulted in mistrial. I should say mistrial as to these defendants that resulted in a conviction of Nasser Abdullah, whose conviction this court reversed on other suppression grounds a few months ago. But the cross-examination didn't take issue with his science. It only took issue with him as being a higher gun, as getting $500 an hour, and so on. And that was effectively the cross-examination. Also, Dr. Proatt was similarly cross-examined on questions about, well, gee, aren't you a friend of Dr. Dudley's, and that kind of thing. So here would have been a witness who would have been able to give us the— He doesn't give you the knowledge. He proves knowledge. You have to prove that there is a knowing problem. Right, and there are two things that go on with Dr. Barrier. One is simply to show that there is a professional disagreement. But the second, more importantly, and what makes him so compelling for us, is that his disagreement was asserted in 2012. His disagreement was asserted around the same time that these defendants were trying to decide whether it was okay for them to sell this substance. And it's not—at that point, his opinion is not being viewed through the lens of 2017 or 2019. In 2012, there was substantial professional disagreement, and even whatever we may say the evidence is, the opinions may be in 2017. In 2012, there was disagreement professionally, and even within the DEA ranks. So that's what makes Dr. Barrier compelling, not merely that he is not the hired gun, but that he adds that other component of being able to establish, quite credibly I think, that there was a disagreement professionally, and therefore reflecting on the question of knowledge. So, Judge Jackson—basically, the materiality question came down to, as this court had said, essentially four issues. One is, is it exculpatory? And the court found that Dr. Barrier's testimony would have been. Two is, is it otherwise admissible? And three, not cumulative. And four is, would it reasonably have been likely to lead to a different result? Judge Jackson—and I want to touch on one point briefly—that the government has noted, as we have noted as well, that the decision to admit evidence or not is, in this case, typically seen as simply an abuse of discretion test. But it is always an abuse of discretion to get the facts wrong. It is always an abuse of discretion to get the law wrong. In this case, Judge Jackson's opinion was based—starting with a mischaracterization of why we even wanted Dr. Barrier, saying that we wanted him just because he would testify about DEA processes. That is not at all what we wanted him for. And that's—and what was said was we wanted him to testify that in 2012, his opinion was that it was not an analog for all the reasons we've discussed. That's important. Judge Jackson goes on to set up this straw man and then to shoot it down by saying, well, Dr. Barrier isn't actually an expert on DEA processes, but that wasn't what we wanted him for. And finally, Judge Jackson's only response to Dr. Barrier as a chemist was that his testimony would be cumulative. And the point that we've tried to make, Rule 403 prohibits the introduction of evidence that is needlessly cumulative. The mere fact that something has a cumulative effect—if he was saying exactly the same thing that Dr. Dudley was saying, exactly the same thing Dr. Croat was saying, that might be needlessly cumulative. But he was adding an entirely different aspect to the case. And, again, as we indicated before, if we knew we were going to have Dr. Barrier testifying, maybe we decided we don't call Dr. Croat. Maybe we decided we don't call Dr. Dudley. We have to—the Judge Jackson said, well, you can't give any credence to that kind of thing because you have to consider it in the context of the entire record, citing Valenzuela-Bernal. As we noted in our reply brief, that's a misplaced reliance because the reliance on Valenzuela-Bernal doesn't say we don't consider what the defense strategy might have been. In fact, that would be a ridiculous argument to make in the context of Valenzuela-Bernal and those other cases. So we believe that that's a situation where—and, again, three specific instances there where we note that Judge Jackson had committed error and, therefore, because he—factual error, and, therefore, his opinion based on those factual errors is not worthy of the protection of the abuse of discretion doctrine. The government has gone on to add other arguments, noting that, well, the—when Dr. Berrier testified, he testified in California, he testified that XLR-11 would qualify as a cannabimimetic substance. If so, that would be a complete defense to the charge that these folks were facing because to be a cannabimimetic means it's a controlled substance. It's not a controlled substance analog, and a controlled substance analog, by definition, is not a controlled substance. So the government's argument, if borne out, would provide a complete defense to us. Unfortunately for us, we don't actually get the benefit of that because XLR-11 never was a cannabimimetic within the meaning of the statute. So the government has both raised a red herring. It turns out to be a completely inappropriate red herring, and it's just not a real response. So there are a lot of other things that I can comment on as far as the specific comments of the government. Just one thing I wanted to note, because this seems to infect a lot of the decision that Judge Jackson made, is the characterization of the DEA as the body, as he wrote in Joint Appendix 2367, at the time the defendants were making their spice, the DEA determined that these cannabinoids are analogs. Then the government made sort of the same argument in their closing argument to the jury, Joint Appendix 1997. But they then, in all of these pleadings here, they say, well, the DEA isn't really the judge of this anyway, and we don't know what you all are talking about. And the answer is, you all are the one who's talking about it, and the government got it wrong, and Judge Jackson mischaracterizes things. And so I think it's important at some point that we recognize that the DEA never determined anything. One panel of the DEA expressed an opinion that is, at most, the opinion of an expert witness, but it is not the DEA, it is not the force of law, it is not a regulation, it is not a statute. So I'm happy to answer any questions the Court may have, or I'll reserve the rest of my time. Well, how about talk about the state of mind evidence? Sure. So the state of mind issue, again, the jury instruction on state of mind, of course, is what we wound up taking up to the Supreme Court in McFadden. McFadden came back with a decision, or the Court came back with a decision that most folks are a little bit confused with, and I cited some instances in our briefs where courts have said, we're trying to figure out what McFadden means. So, number one, we wish that there were better guidance that we could give to juries. That's why we had raised the issue that we raised as instructions. As far as the witnesses go, they fall into two categories. One was witnesses who were willing to come and testify, one of those being Claude Cossy, who's not happy about testifying but would come and would testify and has testified, testified in the Jason Way trial, for example, and is cleared to testify in the Nevada trial. So this is another instance where we're going to get that evidence in. We're even going to get it in as to these particular defendants, just not in Virginia. We'll get it in exactly the same situation in Nevada, but not in Virginia, apparently. You may be answering Judge Floyd's question, but I'm confused. Okay. How can I? He wants to know about the state of mind, the instruction. The exclusion of the evidence. The exclusion of the evidence. So our position is very simply that if, and this is something, basically every case that comes up. Are we talking about the same thing when we talk about the need for the government to prove the knowledge component? Right. And that's what Dr. Berrier's testimony was to go to. Well, that's part of what it would go to, admittedly. But, you know, the point that, and I probably screwed things up originally by making the, by asserting this all as a potential defense of entrapment by estoppel. But as the court noted in Nevada, again. That goes to Cozy and McGee. Cozy and McGee in particular, yes. Right, right. That's the issue. So Timothy Dandar was the other lawyer. He's not willing to testify, but my client would testify. He talked to lawyers. He talked to chemists. This is what they told him. Right, but the issue, you had estoppel, and then you also had a negating mens rea. Advice of counsel defense, and now those don't work, so you want to go with negating the mens rea. Well, yeah, to be precise, once the court said no to those, we asserted them before trial as negating mens rea. This is not something we've just conjured up for the appeal. There are courts, including the Nevada court, the district court, that has ruled on these specific witnesses with these specific defendants that they will be permitted to testify because that court has made the distinction, has accepted the distinction between the affirmative defense on the one hand and negating the government's proof on the other. Well, you have a conflict between district courts, but there's no court of appeals. That's correct. That has done this. What about Mr. McGee, though? As I read his answers to the district court's questions at one point, the district court asked him potential defenses that they acted pursuant to legal counsel, and then Mr. McGee represents, well, it wasn't myself or Mr. Miller. Another lawyer gave them advice with regard to the regality of the substances. It was not Mr. Miller. It was not myself. We have never given such advice and would not give such advice. So what about Menz Rhea would he testify to? It seems like he represented to the court he wasn't going to do that. One of the things that happened later on, and this is all evidence that is in the record as proffered before trial, Mr. McGee testified, I mean, Mr. McGee would testify, and he did proffer, that in addition to, I mean, we can talk about whether the advice that he gave on August 6th was advice that would constitute a defense. But once he got into the case, remember this is at a time in late 2012 into early 2013 when the legality of XLR11, particularly in Florida, was a very hot topic. There was a couple of big court cases going on down there, and Mr. McGee was involved with them, and he was informing them of the status of the chemical opinions and so on and keeping them informed and, in fact, dealing with the lawyers out in Nevada, with the U.S. Attorney's Office out in Nevada to reaffirm the argument that there's nothing illegal about this. So that would all go to Mr. Ritchie's state of mind and to Mr. Galecki's state of mind. So Mr. McGee would be testifying as to what other people told him? He would be testifying as to what he told the appellate. Right. Not for the truth of what he was saying, but simply that the advice that he had given to them and we can produce. Well, he's told the district court he's not given them that advice. It sounds like to me that he's simply going to relay things other people said, but it's not in the form of advice. Well, I guess the question would be if he writes a letter on their behalf to the U.S. Attorney's Office in Nevada saying, is our client's position that blah, blah, blah, that this is not an illegal substance, and referencing Claude Cossy and referencing all that, that is part of helping to fill out the overall picture of why these folks not only were selling the drugs in August of 2012, but why they continued throughout. It may only be a sentencing issue at some point. Maybe the court would decide that it was a relevant, that it doesn't constitute a defense as of August 8th, but at some point along the way that they get the idea that it is in fact a valid defense. Maybe that affects sentencing. There are a lot of different ways it could show up. Okay, thank you. I'm well out of time, I know. Thank you. You have some time on rebuttal. Thank you. Mr. Hurt. Thank you, Your Honor, and good morning. Members of the Court, may it please the Court, I'm Eric Hurt. Counsel today with me is Kevin Hudson. We're also the trial attorneys in this matter with Mr. Snook and Mr. Connell. The issue before the Court, as laid out in the remand on materiality, was decided by Judge Jackson really along the lines of cumulative. And so I think the question before the Court is a couple of things. One, as we look at Mr. Dr. Barrier, is he cumulative? That's why we're here. I think Judge Floyd raises the issue of, well, you can't cross-examine him as a hired gun. And so that makes him, in the words of the defense, unique. We would suggest to the Court that he is not unique. The issue on cumulative and materiality is not defined by the person. It is defined by the evidence or testimony that they will present to the Court. And in this case, Dr. Barrier, and the defense concedes this, would have testified consistently with Dr. Studley and Dr. Crote. In fact, part of their argument before Judge Jackson was that Dr. Barrier's testimony would have buttressed Drs. Crote and Dudley. And that is the, in Judge Jackson's words, the essence of cumulativeness. I think Judge Jackson and I would disagree with the defense's characterization that Judge Jackson set up a straw man and then knocked it down by saying that Dr. Barrier would talk about the processes at DEA. The first part of his opinion, Judge Jackson's, talks about the similarity in testimony that would be offered by Dr. Barrier. But then it goes on to say that, yes, if the defense, even if they were calling him for a different purpose, say the administrative process by which this decision was arrived at, he would not be the right witness to testify and therefore would not meet material on that ground either. But I think Judge Jackson's opinion clearly addresses the issue of Dr. Barrier's, as this court said, his favorable testimony, which is that XLR-11 and JWA-018 are not substantially similar. We agree that he would say that. But that is well plowed through this case. Mr. Hurt, is your argument the same, or are there differences among the circumstances and testimony of Barrier, Cosey, and Wilkie? Can they be differentiated at all as to the primitive value or materiality of their testimony? Yes, ma'am. I believe they are very distinct, and I— I understand that you say they're all cumulative, but are there— No, ma'am. I'm sorry. If I left the court with that impression, I apologize. I do not believe— I'm sorry. No, ma'am. I've interrupted you. If McGee and Cosey, I believe, are of a categorically different nature of witness, Barrier—and I address that first because of the remand on materiality. The issues related to Mr. Cosey and Mr. McGee, I think, are very straightforward. Mr. McGee was an attorney who was not retained until August of 2012. At that point, based on count two and three of the indictment, the defendants had been already selling the product and had formed the mens rea since February of that year. Mr. Cosey, likewise, did not appear on the scene until July of 2012, at which point the defendants had been manufacturing and selling nationwide these products for six months. I mean, we look at count two of the indictment, counts two and three, which allege February of 2012, and in the light most favorable to the government, I think we get to rely on the fact that the conduct started far in advance of either their reliance on counsel or the estoppel argument. I appreciate that. I was having a little trouble because I thought you had— when you had characterized the district court's finding regarding cumulativeness, I was concerned that you were— but you've clarified. Thank you. My apologies for— So your argument would be that Cosey and McGee just deal with a state-of-mind issue. If you were to get there, the cumulativeness is limited to barrierism. That's correct, Judge Agee. And we believe that the Fourth Circuit in Westbrook and Fulcher, Westbrook being the counsel issue and Fulcher being the estoppel issue, have set forth a fairly straightforward procedure by which the court can determine whether or not you can rely on either counsel or a government agent to go forward. We litigated that before the first trial. We litigated that again before the second trial. And the court made findings, which we believe are really dispositive of the issue, that the defendants were fully engaged for at least six months in all of these processes before either Mr. McGee or Special Agent Cosey had any contact with them. So their ability to rely on either legal advice or government action is just not present. How would you differentiate these other district court cases where Dr. Berrier has been permitted to testify as an expert from this case? Well, I guess my... Or do you just think they're wrong? Well, I think it's hard to say what goes on in an individual case. I mean, so many things play into the dynamic, I believe, of a district court, the management of a trial. As Judge Jackson took on the issue of Dr. Berrier, I think it is worth noting that he had been from soup to nuts through this trial once. He had, it wasn't just speculation about what would come out. He knew exactly how things were going to play out. In fact, at the first trial, which resulted in a hung jury, only Dr. Dudley testified on these issues of substantial similarity. So the second trial, which resulted in a conviction, there were two defense experts. In the Michael, in the Jason Way case in California, the defense makes much about here's the trial we want to have. Well, in the Jason Way case, you had Dr. Dudley, who was the defense expert here. You had Cosey. You had Dr. Berrier. And you had Mr. Ritchie all testifying the way the defense would like them to testify here. The jury was not even out half a day and convicted. Cosey and Berrier wouldn't be testifying the same things. Correct. Absolutely, Judge. The testimony of Mr. Cosey, as the defense would portray it, was the DEA came in and told me what I was doing was legal, and so I could go forth and not be prosecuted. With regard to Berrier, the only issue we have here is whether or not he is sufficiently different that his testimony would not be cumulative as a matter of law. Yes, Your Honor. And he is different only from the government's perspective in the sense that he's a different vessel. Right. The issue comes down to here is someone the defense will use to say he's from DEA, and they will cloak him with the aperture of he's a government witness. He must be completely impartial. Why isn't the – you said something earlier that struck me. Why isn't that a reasonable difference? Why is it his status, as someone who would not be subject to the hired gun defense, as someone who adds a different perspective to the discussion, why isn't that enough of a distinction to respond to your concern about killing him? Your Honor, because I would suggest to the court that when you're dealing with witnesses, right, obviously witnesses come in innumerable shapes and sizes. I don't mean that physically, but in the content, the ability to present their evidence, and to create a rule which says that the defense is entitled to a witness who would say the same thing, only in a better package, opens up a door for just a tremendous unquantifiable characteristic. And as we look at Dr. Barrier, this court has decided, and I'm not revisiting that, that in 2013 when his information was provided in the Fadida case to the defense, this court ruled that that was a waiver of the privilege under the administrative decision-making process. And I understand that. I'm not revisiting that. But I would invite the court's attention to the City of Virginia Beach versus Department of Commerce. We had mentioned it previously at 995, Fed Second, 1247, which is a case from this circuit in 1993. And some of the language in there, I would suggest, kind of talks to the evaluation of this type of witness. Because it goes on to say that the deliberative process covers all recommendations, the documents, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency, as well as documents that would inaccurately or prematurely disclose the views of the agency. I think it's entirely appropriate for Judge Jackson in weighing under 403 how this witness would be perceived to take into account those very strong policy considerations. So really you have DEA, which must speak as an agency with one voice. And what you're being asked by the defense to do is to take an outlier at DEA. Honestly, he was one person at DEA who held a different opinion than the agency. And to elevate that opinion to materiality, in effect. And so the question outside of the deliberative process is, does any dissent or within an agency become immediately material, is a worthy consideration for Judge Jackson to make as he's weighing under 403. The confusion that might occur to a jury as to what does that mean, the process? How do we deal with the fact that he was a lone dissenter in this large process that arrived at a final decision for DEA? For all the world, it sounds very strong for impeachment purposes. I guess I'm not quite sure why that is a determination that a jury could make. Because a jury had a problem on this very issue in the second jury trial, I believe? Yes, Your Honor. They had a problem in the first jury trial as well, which resulted in a hung jury. So we acknowledge and we don't hide from the fact that the issue in this case is substantial similarity. But we suggest to the court that the issue of Dr. Barrier, I mean, really the one issue the defense wants to put forward is he was from DEA. And he dissented. Doesn't the Supreme Court in Vanzuolo-Burnell tell us materiality in the Sixth Amendment context comes from Brady? Yes, sir. So why shouldn't they be allowed to pick and choose which witnesses they want to use? They didn't necessarily have to call their two private doctors. So why shouldn't that decision be left up? I mean, Judge Jackson could have said, well, I'll let you call two of them, but you can't call all three of them. And they'd pick and choose. Well, I think at the time we were dealing obviously with the issue of whether or not under Toohey the subpoena was appropriate. And so the focus of the court at the time was slightly different, Judge Floyd, than what you are phrasing the question as now. As we look at it now, and of course Judge Jackson in hindsight has to deal with the issue of materiality, knowing what he knows about the first trial and the second trial. And so the testimony that Dr. Barrier would give, I think we all agree on this, is that the drug or the two substances, XLR11 and JW8018, are not substantially similar. And he would talk in general terms about how he arrived at that decision. That testimony is, in effect, the same testimony that would be given by Dr. Scrote. Even if the testimony is cumulative, their point, and I get your argument that this is what I'd do if I were representing the defendant, I'd want to make the DEA doesn't know what it's doing argument. But their point is the experts are qualitatively different because Barrier is the only one that they can avoid impeachment on a pecuniary motive. And I agree, Your Honor, that is their argument. But that does not suggest, I would say that does not rule out the possibility of other areas of impeachment for Dr. Barrier. I mean, just because he isn't getting paid. Right, I mean, that's true. There could be a whole lot of things that would be fair game for impeachment if he were allowed to be a witness. But as I read the issue they've raised, it is there is this qualitative difference between Dr. Barrier and the other two experts. And why isn't that sufficient to say that it's an abuse of discretion not to allow him to be a witness? Because, well, Judge, that's a, and I might sound like I'm disagreeing and I'm not in the sense that doesn't that, that's a rhetorical question, doesn't that become the issue then of weight for the testimony? If Dr. Barrier is not subject to a certain type of cross-examination, that then becomes a weight issue. He is not a magical witness who is so completely different. And so as to Dr. Barrier, there may be a million motives as to why he gave this opinion, which make him, which take him out of this materiality claim that the defense makes on pecuniary. We're focused on pecuniary, but all witnesses have the ability to be cross-examined. In fact, this witness we know now has pleaded guilty to wanting to have sex with a 14-year-old girl. And so there, there's. There's a lot to be considered in whether to call him as a witness. I guess the problem that I'm having sort of echoes that that Judge H is making. I'm still not quite understanding why the defendant can't decide subject to, and the district court did not say anything about the issue of confusion. But on this, on this mens rea issue, which is critical, that they want to present the strongest, the strongest candidate. Well, Your Honor, and I guess maybe wrongly, but I don't view this as a mens rea issue. This is a, this is a pure decisional issue on the quality of the substance. It has, Dr. Barrier has no impact on their mens rea because they were completely unaware of his dissent at the time of their action. There is no evidence that this information from Dr. Barrier was not made public until the FADEDA trial, which was after, after they, they being the defendants, suggest they had divested themselves of the company. Rather than look at this thing through 403, aren't we supposed to ask ourselves a question whether the testimony of Dr. Barrier would have, there's a reasonable probability that it would have changed the outcome of the case? Yes, Your Honor. And I would suggest to the court that there's no strong basis to say that. In fact, the one case where he has testified as the defense wanted, the result was guilty. And so empirically, we have him testifying the way the defense wanted, and the jury found the defendant guilty. If he were to testify, and the jury believed his testimony, that that would go not to any issue of mens rea. It would go, as a matter of law, to whether or not the substance is qualified under the statute. Absolutely, Judge. There is no mens rea issue here. There is no evidence, nor has there ever been any evidence, that the defendants knew about Dr. Barrier. It still seems like to me this comes back to on him. Is there a qualitative difference between he and the other two expert witnesses? It goes back to a question Judge Boyd asked some time ago. Judge Jackson had said, all right, you've got three experts, I'm going to let you have two. You pick them. Then I don't think they'd have much of an argument. But that's not what happened, because they were only allowed to have two, because Barrier was excluded. And I'm still not quite sure why that qualitative difference on lack of pecuniary motive isn't sufficient to allow him to have been a witness. And I guess I would offer to the court that the district court judges frequently are called upon to make these balancing decisions. And unfortunately, because of the posture we're in now, the frame of reference is slightly different. But again, I would maybe foolishly come back to the issue that this is a witness who I don't think we can look at in a vacuum. He is going to have significant, he doesn't come to the table with completely unimpeachability. And so to look at it versus pecuniary versus other matters, he's a witness. All those other arguments of impeachment would be for the district court to take up in the first instance. And they may, if we were to decide to send this back, Dr. Barrier gets to testify, they may call him. It could be a disaster for them. But that's not the point that we have to decide in this case. Yes, sir, or the court may remand with orders to allow, and they might choose the same two experts. Thank you, Joshua. Thank you. Thank you. Just a couple points that I wanted to make quite quickly. The first is that the government persists in a mistake that Judge Jackson persisted in making, and that is to conflate the intent to sell with the knowledge of the character of the substantial similarity of the substance. You just want to show that it's perfectly possible for people to disagree. Well, that's certainly one thing I want to show. What Judge Jackson gets hung up on is this notion of because they were selling XLR11 before all of these things happened in July and August, that somehow or another that means they knew that it was a controlled substance analog. And our evidence would be, yes, they were selling it because they thought it wasn't, because they were getting advice that it wasn't from Timothy Dandar, the lawyer in Florida, from Adam Libby, the chemist that they worked with. So the government and Judge Jackson are conflating these two issues, which are different pieces of the mens rea, of the knowledge question, but they are very different and they should not be put together. The government was talking about the rule that the government was looking for is the compulsory process clause. The rule that the government was looking for does not give the government a veto power on who our witnesses are. It doesn't even give the trial judge a veto power on who our witnesses are. Third point I wanted to make real briefly, Dr. Barrier, if they believe he is such an impeachable witness, why are they fighting tooth and nail to keep him out? Every court we go to, whether it's out in Nevada, whether it's the folks in California, they're fighting to keep Dr. Barrier out. Why are they fighting him so hard? Barrier actually has testified twice. One time there was an acquittal on all charges. That was the Kansas case we made reference to in our brief. The U.S. versus Adams and Broombaugh were the two defendants who went to trial. Jason Way was convicted, admittedly, but Adams and Broombaugh were found not guilty. Let's see. One of the other points in sort of to wrap things up, I don't know if the court has other questions about other issues, but the things that I sort of wanted to respond to, I did rather quickly, and I just wanted to touch on one thing, that we are asking the court to remand to have it heard by a different judge. And the court may decide that a way to deal with or not deal with some of these evidentiary issues would be to remand to a judge to consider those things ab initio, as they may appear in the context of a trial or something like that, so that it's not seen that Judge Jackson's rulings would not be seen as being the law of the case and somehow binding on a different trial. The other point that I wanted to make quickly, you have, last time around, you issued a ruling 15 days after argument. 18 days after today, our clients are going to get put on a bus to be put on a plane to be flown out to Nevada if they are not bonded out. And so I don't know whether the court would be in a position to make a quick decision, as you did last time, but I just wanted to note that if there were a way to make a decision, let's say, in 13 days rather than in 21 days, it could make an enormous difference to our clients as well as to the government in the expense of how they get out to Nevada. What's the sudden emergency about that? I'm sorry? What's the sudden emergency about that? They've got a trial date in Nevada that starts May 13th, and the BOPs, or the marshal service process, is that they move them out there a month ahead of time. So because the particular prison they're at, Talladega, FCI, they move people out on Mondays. April 8th is the target for when they would likely be moved out. Thank you very much. Thank you. We'll come down and greet counsel and proceed directly to our last case. Thank you.
judges: Allyson K. Duncan, G. Steven Agee, Henry F. Floyd